UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN DIME WE TRUST, RLT, et al.,

    Plaintiffs,

 v.                             CASE NO. 8:21-cv-01967-SDM-AAS

ARMADILLO DISTRIBUTION ENTERPRISES,
INC., et al.,

    Defendants.
_____/

**ORDER**

Darrell Lance "Dimebag" Abbott was an acclaimed guitarist who led Pantera, a band avidly celebrated and loyally followed by admirers of "heavy metal," a popular genre of modern music. After Pantera disbanded, Darrell assembled and "fronted" another band, Damageplan. On December 8, 2004, while on stage during a performance by Damageplan in Columbus, Ohio, Darrell was murdered — shot to death by a deranged man who himself was shot to death a moment later. Darrell's artistic success and fame, along with his nickname and his strong association with both "heavy metal" and a singular guitar design, offered Darrell an opportunity to benefit financially from his name, image, and likeness, as well as his endorsement and characteristic guitar design.

Darrell and his successors entered with a musical-instrument company an agreement, and later a re-stated agreement, to exploit that financial opportunity.

Considered (1) after a careful and disinterested examination of the factual and legal history, which is extended and sometimes tortuous but not inaccessible; (2) after excluding the many and enlivened but often irrelevant skirmishes among the parties; and (3) with the benefit of detailed and protracted briefing and a thorough and extensive oral argument, the agreement and the re-stated agreement reveal a clearly discernible array of rights, reliably identify who enjoys which rights, and — more than twenty years after Darrell's murder — permit this painful conflict to approach more closely a conclusion.

Darrell died intestate and his estate passed in equal shares to his father, Jerry Abbott, and his brother, Vincent Abbott, who died in June 2018 and transferred by will to Rita Haney his one-half interest in the estate. In May 2020 Rita Haney and Jerry Abbott transferred their respective one-half interests in the estate to In Dime We Trust, a Texas revocable living trust. GetchaPull Incorporated, an intellectual property holding company, is wholly owned by In Dime We Trust. In this order, the plaintiffs — In Dime We Trust, the Estate of Darrell Abbott, and GetchaPull Incorporated — are collectively "the Trust." Similarly, the defendants — affiliate companies Armadillo Distribution Enterprises, Inc., doing business as Dean Guitars, and Concordia Investment Partners, LLC — are collectively "the Company."

The Trust sues (Doc. 146) the Company and alleges trademark infringement, cancellation of trademark registration, copyright infringement, false endorsement and designation of origin, breach of contract, fraud, and violation of FDUTPA. The Trust requests declaratory relief and an equitable accounting. (Doc. 146) The

- 2 -

Company moves (Doc. 234) for summary judgment, the Trust responds (Doc. 256), and the Company replies (Doc. 265).  The Trust moves (Doc. 239) for partial summary judgment, the Company responds (Doc. 252), and the Trust replies (Doc. 264).

## BACKGROUND

In 2004 Darrell entered an agreement with the Company for the manufacture, advertising, promotion, and distribution of a line of guitars bearing Darrell's name, image, and likeness.  (Doc. 110-4)  Darrell died a month later.  In 2014, Vincent Abbott, personal representative of Darrell's estate, entered a re-stated agreement with the Company.  (Doc. 110-5)  The re-stated agreement grants the Company a license to manufacture, distribute, advertise, promote, and sell "Endorsed Products," that is, "Dean Guitars, manufactured, distributed, promoted, advertised and sold by the Company solely under a specialized line bearing Dime's name, approved likeness, endorsement and/or approved logos":[1]

> 3. <u>Grant of Endorsement Rights.</u> Subject to the terms and conditions set forth herein, Vincent grants to Company the exclusive right and license, within the Contract Territory and during the Contract Period, to use the Dime Endorsement solely in connection with the manufacture, distribution, advertisement, promotion and sale of Endorsed Products.

(Doc. 110-5 at ¶ 3)

> 1. <u>Definitions</u>: As used herein, the terms set forth below shall be defined as follows:
>
> (a) "Dime Endorsement" shall mean the name, approved likeness, approved photograph, and endorsement of Dime.

---

[1] The 2004 agreement and the 2014 re-stated agreement are substantively identical; the re-stated agreement merely substitutes the name "Vincent" for the name "Dime."  (Docs 110-4 and 110-5)

> (b) "Endorsed Products" shall mean Dean Guitars, manufactured, distributed, promoted, advertised and sold by the Company solely under a specialized line bearing Dime's name, approved likeness, endorsement and/or approved logos.

(Doc. 110-5 at ¶¶ 1(a), (b))  The agreement requires joint registration of any trademark for "Endorsed Products" and requires the Company to "cease producing Stealth or Razorback style guitars" if the agreement is "terminated."

> 17. <u>Trademark</u>. In the event that Company or Vincent desire to obtain a trademark or trademarks for Endorsed Products, Company and Vincent agree to execute any and all documents which either party reasonably believes to be necessary and/or desirable for the successful registration and protection of such trademark or trademarks during the term of this Agreement. Such trademark or trademarks shall be registered in the name of and belong to the Company and Vincent jointly, and each shall have the right to use and employ such marks after termination of this Agreement. The parties shall jointly pay for the cost of registration of any marks developed and owned by the parties pursuant to this Agreement. Vincent agrees that he shall not acquire any interest whatsoever in the Company's trade names or trademarks, nor any right, during the term hereof or thereafter, to manufacture, distribute or sell Endorsed Products, utilizing any trade names or trademarks of or owned by Company. The Company acknowledges and agrees that all rights in the tradenames "Dime" and "Dimebag Darrell", and in the Dime Endorsement, and all variations thereof, are and shall remain the property of Vincent. The Company shall acquire no rights in the tradenames or designs "Stealth Guitar" or "Razorback Guitar" by virtue of this Agreement, and upon termination of this Agreement shall cease the production of Stealth and Razorback style Guitars.

(Doc. 110-5 at ¶ 17)  The agreement specifically delineates each party's "special right of termination":

> 22. <u>Special Right of Termination by Vincent</u>. Vincent shall have the right to terminate this Agreement upon Thirty (30) days prior written notice to Company in the event of the occurrence of any of the following contingencies:
>
> (a) If Company is adjudicated as insolvent, declares bankruptcy or fails to continue its business of selling Endorsed Products; or

(b) If Company fails to make payment to Vincent of any sums due pursuant to this Agreement within Ten (10) days following the date such payment is due hereunder, provided that Company is notified in writing of such nonpayment by Vincent or his representative and such payment is not made within Twenty Five (25) days following such notification.

(c) If the Company commits any other material default hereunder and fails to cure with Thirty (30) days of receipt of written notice thereof.

23. <u>Special Right of Termination by Company</u>. Company shall have the right to terminate this Agreement upon Thirty (30) days prior written notice to Vincent or his representative in the event of the concurrence of any of the following contingencies:

(a) If Vincent commits any material default hereunder and fails to cure within Thirty (30) days of receipt of written notice thereof.

(Doc. 110-5 at ¶¶ 22 and 23)  Neither party terminated the agreement.  The re-stated agreement — fully performed and at the conclusion of the stated duration — expired in June 2017, but through at least April 2020 and with the Trust's acquiescence the Company (1) continued to produce and sell guitars bearing Darrell's name, image, and likeness; (2) continued to use the Stealth guitar design, the Razorback guitar design, the STEALTH wordmark, and the RAZORBACK wordmark; and (3) continued to pay a royalty equal to the royalty established under the expired, re-stated agreement.  A June 2021 demand letter informed the Company that the re-stated agreement "naturally terminated in October 2020."  (Doc. 110-6)  The Company continues to sell Razorback-design and Stealth-design guitars and to use the STEALTH and the RAZORBACK wordmarks.

## DISCUSSION

### I.    Counts I–V: The Lanham Act Claims

The Trust asserts against the Company a claim (Count I) for trade dress infringement of the Stealth guitar design, a claim (Count IV) for trade dress infringement of the Razorback guitar design, a claim (Count II) for trademark infringement of the STEALTH wordmark, a claim (Count V) for trademark infringement of the RAZORBACK wordmark, and a claim (Count III) for cancellation of the Company's registered trade dress in the Razorback guitar design.  (Doc. 146)  The Trust and the Company move for summary judgment on the Trust's trademark infringement claims (Counts I, II, IV, and V) and the Trust's claim for cancellation (Count III) of registered trade dress.

#### a.  Counts I, II, IV, and V: Trademark Infringement

To state a claim for trademark infringement a plaintiff must show "trademark rights in the mark or name at issue and [show] that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citation omitted).  Registration is not required to show trademark rights in a mark or name.  *Matal v. Tam*, 582 U.S. 218, 225 (2017) ("Even if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act[.]").  Trademark rights are acquired through "actual prior use in commerce." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001).

The Company argues that the Trust cannot show actual prior use in commerce because the Trust never produced or sold Razorback or Stealth design guitars. In response, the Trust argues (1) that the two agreements with the Company and an earlier agreement with Washburn International each constitute a license to use both the STEALTH and RAZORBACK wordmarks and the Stealth and Razorback guitar designs and (2) that the benefit of prior use under those agreements inured to the Trust, as the licensor.

Prior use is established through "evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Planetary Motion,* 261 F.3d at 1194 (11th Cir. 2001). The use of a licensed mark by a licensee inures to the benefit of the licensor but not to the benefit of the licensee. *See Clayton v. Howard Johnson Franchise Syst., Inc.*, 730 F. Supp. 1553, 1560 (M.D. Fla. 1988); *Licensing Corp. v. U.S. Med. Care Holdings LLC,* 2007 WL 2051009 at *14 (S.D. Fla. July 13, 2007).

The 2004 agreement and the re-stated agreement each grant the Company during the contract period the "exclusive right and license" to use the "Dime Endorsement" — Darrell's name, approved likeness, approved photograph, and endorsement — in connection with the manufacture and sale of "Endorsed Products," defined as Dean guitars sold by the Company under a specialized line bearing Darrell's "name, approved likeness, endorsement and/or approved logos." (Doc. 110-5 at ¶¶ 1(a), (b)) Neither agreement grants the Company a license to use the STEALTH and the

RAZORBACK wordmarks or to use the Stealth and the Razorback guitar designs. Each agreement requires the Company to cease "production of Stealth and Razorback style Guitars" only if the agreement is terminated. (Doc. 110-5 at ¶ 17) Because neither agreement with the Company constitutes or grants a license to use the STEALTH and RAZORBACK wordmarks or the Stealth and Razorback guitar designs, the Company's use of the STEALTH and RAZORBACK wordmarks or the Stealth and Razorback guitar designs inured to the Company's benefit, not to the Trust's benefit.

The Trust's only argument for an earlier prior use is (1) that a 2001 agreement with Washburn constituted a license to use the STEALTH or RAZORBACK wordmarks and Stealth and Razorback guitar designs and (2) that, as a result, Washburn's use of the STEALTH wordmark and production of Stealth design guitars during the term of the Washburn agreement inured to the Trust's benefit. But similar to the agreements with the Company, the Washburn agreement licensed to Washburn the use of Darrell's name and likeness only. The Washburn agreement states:

> Artist agrees to allow Washburn the exclusive right to use his Name and Likeness solely in connection with trade advertising and promotion of Signature Merchandise.

(Doc. 110-1 at ¶ 2)

> All trademarks, copyrights and other intangible property rights specified herein and arising out of or relating to the Signature Merchandise shall be the sole property of Washburn with the exception of the Stealth body and headstock shape, Washburn maintains the exclusive right to commercially exploit and use all such rights for the purpose of trade advertising of Signature Merchandise only during the term of this Agreement, and during any sell of period permitted under Section 16 and Section 18 to enable Washburn to dispose of any excess

> inventory following the termination or expiration of this Agreement. Upon conclusion of the sell-off period, no further sale of Signature Merchandise bearing the name and/ or likeness of the Artist shall occur. The artist will not dispute ownership of Washburn trademarks, patents, copyrights or other intangible or intellectual property rights at any time during or after the term of this contract. Artist agrees to aid Washburn in the acquisition of patents, trademarks, copyrights and other intangible or intellectual property rights relative to the Signature Merchandise other than the Stealth body and headstock shapes, which Washburn will pursue at it's own non-recoupable expense should it decide to pursue such. Should this contract or a replacement contract not be renewed in the future, Washburn will allow the Artist to produce the Dime 3 body and headstock shape without license fee, whether that be on his own or thru an [sic]other exclusive endorsement with another competitor. Artist agrees that he ahs no right o sub license the use of the Dime 3 body and headstock shape without prior specific approval of Washburn or use it or allow it to be used on any guitar other [six] his exclusively endorsed guitar. As the owner of the trademarks, Washburn maintains the right to use, protect and defend those trademarks.

(Doc. 110-1 at ¶ 12)  The RAZORBACK wordmark, the STEALTH wordmark, and the Razorback guitar design are never mentioned in the Washburn agreement.  The Stealth guitar design is mentioned in the Washburn Agreement only once. And by the Washburn Agreement's plain language, Washburn is permitted to pursue intellectual property rights in the Stealth body and headstock shapes only "at its own non-recoupable expense."  The Washburn agreement neither explicitly nor implicitly nor otherwise licenses to Washburn the right to use the STEALTH or RAZORBACK wordmark or the Stealth or Razorback guitar design.  Because the Trust cannot show prior use, the Company is entitled to summary judgment on the Trust's claims (Counts I, II, IV, and V) for trademark infringement.

**b.    Count III: Cancellation of the Company's Razorback Trade Dress Registration**

In 2009 the Company obtained registration of the Razorback guitar design. (Doc. 146-1)  The Trust and the Company move for summary judgment on the Trust's claim (Count III) for cancellation of the Company's registration of the Razorback guitar design.  Under 15 U.S.C. § 1119, "In any action involving a registered mark, a court may order the cancellation of the registration, in whole or in part, when such action is warranted." *Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008).  Under 15 U.S.C. § 1064(3), fraud in connection with the application for registration of a mark is a valid basis for cancellation.  A party requesting cancellation based on fraud must prove by clear and convincing evidence that the applicant knowingly misrepresented material facts in connection with applying for the registered mark. *Angel Flight*, 522 F.3d at 1209 (citations omitted).

The Trust argues that the Company knowingly misrepresented material facts to the USPTO through declarations in connection with the trademark application for the Razorback guitar design, specifically:

> The signatory believes that the applicant is the owner off the trademark/service mark sought to be registered; and

> To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

(Doc 146 at ¶ 115)  According to the Trust, the Company's declarations to the USPTO are fraudulent because the Company had no rights in the Razorback guitar

- 10 -

design and had expressly disclaimed ownership rights in the Razorback guitar design. The re-stated agreement states:

> The Company shall acquire no rights in the tradenames or designs "Stealth Guitar" or "Razorback Guitar" by virtue of this Agreement, and upon termination of this Agreement shall cease the production of Stealth and Razorback style Guitars.

(Doc. 110-5 at ¶ 17)  The Company's use of the STEALTH and RAZORBACK wordmarks and Stealth and Razorback guitar designs during the term of each agreement inured to the Company's benefit because neither agreement licensed the Company the right to use the STEALTH and RAZORBACK wordmarks and Stealth and Razorback guitar designs.  The text "[t]he Company shall acquire no rights in the tradenames or designs 'Stealth Guitar' or 'Razorback Guitar' by virtue of this Agreement" only clarifies that the agreements neither explicitly nor implicitly grant the Company rights in the Stealth or Razorback tradenames and guitar designs.  Therefore, the Company represented to the USPTO a good faith belief — not because of the agreement but based on prior use — that they owned the RAZORBACK wordmark and Razorback guitar design.  The Company is entitled to summary judgment on the Trust's claim (Count III) for cancellation of trademark registration.

## II.    Counts VI and VII: Copyright Infringement

The Trust asserts a claim (Count VI) for copyright infringement of Darrell's two-dimensional drawing of the Razorback (RZR) guitar design and a claim (Count VII) for copyright infringement of Darrell's "Dean from Hell" (DFH) artwork.  The Company moves for summary judgment.

- 11 -

To succeed on a claim for copyright infringement a plaintiff must show "(1) ownership of a valid copyright[] and (2) copying of constituent elements of the work that are original." *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1156 (11th Cir. 2024), *cert. denied sub nom. Rutstein v. Compulife Software, Inc.*, 145 S. Ct. 1172 (2025) (citations omitted). A party can demonstrate ownership through registration with the Copyright Office. *Architects Collective v. Pucciano & Eng., Inc.*, 247 F. Supp. 3d 1322, 1337 (N.D. Ga. 2017). Under 17 U.S.C. § 410I, a certificate of registration "made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate."

The Copyright Office approved the Trust's copyright registration of the DFH artwork in November 2021. (Doc. 146-3) The Company acquiesces to the Trust's claim of copyright ownership of the DFH artwork, but the Company maintains that the Company after June 2021 never sold guitars bearing the DFH artwork. In response, the Trust again points to the Company's 2022 royalty reports. (Doc. 261-2) Because a genuine dispute of material fact — whether the Company sold guitars bearing DFH artwork after June 2021 — remains unresolved the Company is not entitled to summary judgment on the Trust's claim (Count VII) for infringement of the DFH copyright.

The Copyright Office approved the Trust's application for registration of the RZR guitar design in May 2022, approximately seventeen years after first publication in January 2005. (Doc. 146-2) Because the Trust failed to register the RZR

- 12 -

copyright within five years after first publication, the certificate of registration is not entitled to a presumption of validity. *See Webster v. Dean Guitars*, 955 F.3d 1270, 1276 (11th Cir. 2020). The "evidentiary weight accorded a certificate registered more than five years after the first publication" is discretionary. *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851 (6th Cir. 1991); *see also Thornton v. J Jargon Co.,* 580 F. Supp. 2d 1261 (M.D. Fla. 2008).

The Company argues that under 17 U.S.C. § 113 the Trust's infringement claim fails because the RZR copyright extends to a "useful article." Under 17 U.S.C. § 101, a "useful article" is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." While The Copyright Act, 17 U.S.C. § 101, affords no protection to a useful article, the "design of a useful article" is protectable if "such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 417 (2017), explains the analysis:

> A feature of the design of a useful article is eligible for copyright if, when identified and imagined apart from the useful article, it would qualify as a pictorial, graphic, or sculptural work either on its own or when fixed in some other tangible medium.

The original design elements must have the capacity to exist independently of the useful article as a pictorial, graphic, or sculptural work:

> Of course, to qualify as a pictorial, graphic, or sculptural work on its own, the feature cannot itself be a useful article or "[a]n article that is normally a part of a useful article" (which is itself considered a useful article). § 101. Nor could someone claim a copyright in a useful article merely by creating a replica of that article in some other medium—for

- 13 -

example, a cardboard model of a car. Although the replica could itself be copyrightable, it would not give rise to any rights in the useful article that inspired it.

*Star Athletica,* 580 U.S. at 415.

The RZR copyright fails the "independent-existence" requirement of the *Star Athletica* separability test.  The original aspects of the Razorback guitar design, if removed from the image and affixed to a different medium, replicate a guitar.  The RZR copyright — a two-dimensional sketch of the Razorback guitar design — is conceptually equivalent to a drawing of a car or *Star Athletica*'s hypothetical cardboard car model.  The Trust cannot defeat the Company's superior trademark rights in the Razorback guitar design by later obtaining a copyright on the RZR drawing. The Company is entitled to summary judgment on the Trust's claim (Count VI) for infringement of the RZR copyright.

## III.    Count VIII: Declaratory Relief

The Trust requests (Count VIII) a declaration that In Dime We Trust, RLT, owns a perpetual license to use the "Dime3" guitar design.  The Washburn agreement states:

> Should this contract or a replacement contract not be renewed in the future, Washburn will allow [Darrell] to produce the Dime 3 body and headstock shape without license fee, whether that be on his own or thru an other exclusive endorsement with another competitor. [Darrell] agrees that he has no right to sub license the use of the Dime 3 body and headstock shape without prior specific approval of Washburn or use it or allow it to be used on any guitar other his exclusively endorsed guitar. As the owner of the trademarks, Washburn maintains the right to use, protect and defend those trademarks.

(Doc. 110-1 at ¶ 12)  Washburn filed an application for trademark registration of the Dime 3 guitar design on August 30, 2001, and the USPTO approved registration on July 2, 2002.  (Doc. [146-4])  The royalty agreement with Washburn terminated on October 30, 2004.  (Doc. 110-1 at ¶ 1)  On December 1, 2004, Washburn assigned to Concordia Investment Partners, Inc., the right to the "Dime3" guitar design.  On April 23, 2019, Concordia Investment Partners, Inc., assigned the right to the "Dime3" guitar design to Concordia Investment Partners, LLC.  Registration No. 2588629, https://tmsearch.uspto.gov/search/search-results/78081982.  The Trust argues that because a pre-existing license to Darrell encumbered the "Dime3" guitar design when Washburn assigned the design to the Company, the Company acquired the right to use the "Dime3" only subject to Darrell's license.  The Company argues in response that, because the Trust alleges a mere desire to use the "Dime3" guitar design but neither produces nor sells guitars of any kind, the question is not ripe for declaratory relief.  Because no material in the record supports a course of conduct sufficient to show that the Trust has produced, is producing, or is prepared and able to produce the "Dime3," the Company is entitled to summary judgment that the Trust's request (Count VIII) for declaratory relief is unripe for adjudication.

## IV.   Count IX: False Endorsement, False Association, and False Designation of Origin

The Company moves for summary judgment on the Trust's claim (Count IX) for false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).  To succeed on a claim under 15 U.S.C. § 1125(a)(1)(A), a

plaintiff must show "a likelihood of consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of goods being sold." *Webster v. Dean Guitars*, 955 F.3d 1270, 1278 (11th Cir. 2020) (citations omitted).   The likelihood of confusion depends on:

> (1) the strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks; (5) similarity of advertising methods; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Webster*, 955 F.3d at 1278 (11th Cir. 2020).

The Trust bases the claim for false endorsement on alleged continued sale by the Company of endorsed products bearing Darrell's name, image, and likeness after expiration of the re-stated agreement in June 2021.  In support, the Trust identifies the Company's royalty report (Doc. 261-2), which shows the purported sale of endorsed products through "at least August 2022." (Docs. 146 at ¶ 197 and 261-2).[2] The Company denies selling any endorsed product after June 2021.  Because the record reveals a genuine dispute of material fact — whether the Company sold an endorsed product after June 2021 — the Company is not entitled to summary judgment on the Trust's claim (Count IX) for false endorsement, false association, and false designation of origin.

---

[2] The Company royalty report (Doc. 261-2) shows for "Q1 2022" an amount "Payable to In Dime We Trust" of $28,406.76.

- 16 -

## V.     Counts XI and XII: Fraud and FDUTPA

The Company moves for summary judgment on the Trust's claims for fraud (Count XI) and violation of the Florida Deceptive and Unfair Trade Practices Act (Count XII).  The Trust premises each claim on the Company's "assurance that [Darrell] would continue to own all rights in his guitar names and designs, and [the Company's] express[] disclaim[er] [of] the rights in the [sic] tradenames and designs 'Stealth Guitar' or 'Razorback Guitar."  (Doc. 146 at ¶¶ 240, 266.)

Under Florida law, to prevail on a claim of common law fraud a plaintiff must show "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (citation omitted). The Trust fails to identify a false statement of material fact.  The text of the re-stated agreement clarifies that the agreements neither explicitly nor implicitly grant the Company rights in the STEALTH and RAZORBACK wordmarks or Stealth and Razorback guitar designs: "[t]he Company shall acquire no rights in the tradenames or designs 'Stealth Guitar' or 'Razorback Guitar' by virtue of this Agreement."  The Company is entitled to summary judgment on the Trust's claim (Count XI) for fraud.

To prevail on a claim for deceptive trade practice under FDUTPA a plaintiff must show "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190 (11th Cir. 2024) (citation omitted).  Under Section 95.11(3)(e), Florida Statutes, the limitation for a claim under

FDUTPA is four years. *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 Fed. Appx. 899, 906 (11th Cir. 2013). A plaintiff must initiate an action under FDUTPA "within four years of discovering the facts underlying the action, or within four years of when those facts should have been discovered with diligence." *Marlborough,* 505 Fed. Appx. at 906.

The parties entered the first agreement in 2004. (Doc. 110-4) The Company obtained registration on the principal registry of the RAZORBACK wordmark and Razorback guitar design in 2009. (Docs. 146-5 and 146-1) The parties entered the re-stated agreement in 2014. (Doc. 110-5) Because registration on the principal registry serves as constructive notice to other potential users of the registrant's claim of ownership, the limitation for the Trust's claim under FDUTPA began when the Company obtained trademark registration. *See Royal Palm Props., LLC v. Pink Palm Props., LLC,* No. 9:17-CV-80476, 2018 WL 1138304 (S.D. Fla. Mar. 2, 2018). The Trust initiated the instant action in 2021 (Doc. 1), approximately twelve years after the Company obtained registration of the RAZORBACK wordmark and Razorback guitar design. The Trust's claim under the FDUTPA is time-barred. The Company is entitled to summary judgment on the Trust's claim (Count XII) for deceptive trade practice.

## VI.    Count XIII: Accounting

The Trust requests (Count XIII) an accounting of payments owed under the re-stated agreement, and the Company moves for summary judgment. To state a claim for an equitable accounting a plaintiff must show (1) that the parties share a

- 18 -

fiduciary relationship or that the questioned transactions are complex and (2) that a remedy at law is inadequate. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1071 (11th Cir. 2007). The Trust fails to establish that a remedy at law is inadequate. The Trust's remaining claims — a claim for false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A) and a claim for copyright infringement of the DFH artwork — each supply a remedy for disgorgement of profits. *See 15 U.S.C. § 1117(a); 17 U.S.C. § 504(b).* Because an adequate remedy at law remains available, the Company is entitled to summary judgment on the Trust's claim for an accounting.

## VII.   Count X: Breach of Contract

According to the Trust, the Company breached the re-stated agreement by:

> (i)   continuing to produce the Stealth Guitar Design despite termination of the Endorsement Agreements;
>
> (ii)   continuing to produce the Razorback Guitar Design despite termination of the Endorsement Agreements;
>
> (iii)   continuing to use the RAZORBACK trademark despite termination of the Endorsement Agreements;
>
> (iv)   continuing to use the STEALTH trademark despite termination of the Endorsement Agreements;
>
> (v)   failing to pay the contracted amount for each full cover photo that [has] been printed with Abbott playing a Dean guitar, with the Defendant Dean Guitars' logo and/or trademark prominently displayed;
>
> (vi)   failing to provide the imported and domestic models for each line of Abbott endorsed guitars produced by Defendant Dean Guitars, and other guitars for personal and promotional use;
>
> (vii)   fraudulently, in conjunction with Defendant Concordia and without the knowledge of Abbott or the Estate, registered the trademark for RAZORBACK and the Razorback guitar design, both of which were

- 19 -

the sole property of Abbott and the Estate, in Defendant Concordia's name;

(viii) in conjunction with Defendant Concordia, transferred the RAZORBACK trademark, which was the sole property of Abbott and the Estate, to a third party without the knowledge of Abbott or the Estate; and

(ix)   in conjunction with Defendant Concordia, acquired the registered trade dress for the guitar design known as the Dime3, without Abbott's or the Estate's knowledge and without recognizing Abbott or the Estate as a joint owner.

(Doc 146 at 65–66)

The Trust contends that the re-stated agreement grants the Company both a license to produce, promote, and sell "Endorsed Products" and a license use the STEALTH and RAZORBACK wordmarks and Stealth and Razorback guitar designs.  The Company argues that the re-stated agreement grants the Company only a license to produce, promote, and sell "Endorsed Products."

Under Florida law, the licensing agreement "is the best evidence of the parties' intent, and its plain meaning controls." *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 143 So. 3d 881, 890 (Fla. 2014).  The plain text of the re-stated agreement grants the Company a license only to manufacture, distribute, advertise, promote, and sell "Endorsed Products," that is, "Dean Guitars, manufactured, distributed, promoted, advertised and sold by the Company solely under a specialized line bearing Dime's name, approved likeness, endorsement and/or approved logos."  (Doc. 110-5 at ¶¶ 1 and 3)

The Trust submits as support e-mail exchanges (Doc. 299-1, Exs. A–M) between Rita Haney and former Dean CEO Elliot Rubinson.  According to the Trust,

- 20 -

the e-mails show the Company treated the STEALTH and RAZORBACK word-marks and the Stealth and Razorback guitar designs as Darrell's property.  Therefore, the Trust argues, the e-mails evidence the parties' intent for the re-stated agreement to grant the Company not only a license to use Darrell's name, image, and likeness, but also a license to use the STEALTH and RAZORBACK wordmarks and Stealth and Razorback guitar designs.

Under Florida law, extrinsic evidence is considered "only when confronting an ambiguous contract provision, and courts are barred from using evidence to create an ambiguity to rewrite a contractual provision[.]" *Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174 (11th Cir. 2002) (quoting *J.C. Penney Co., Inc. v. Koff*, 345 So.2d 732, 735 (Fla. 4th DCA 1977)).  *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010), explains that the language of a contract is ambiguous if "suscepti-ble to more than one reasonable interpretation."  An ambiguity is "[a]n uncertainty of meaning based not on the scope of a word or phrase but on a semantic dichotomy that gives rise to any of two or more quite different but almost equally plausible inter-pretations." Antonin Scalia and Bryan A. Garner*, Reading Law: The Interpretation of Legal Texts*, 425 (2012).  For example, a contract between a homeowner and a neigh-bor might grant the neighbor "access to and enjoyment of the bay."  The home-owner's property includes both a corral containing a reddish-brown horse and a

hundred yards of waterfront on a body of salt water.  "Bay" conveys (at least) two, different, but equally plausible meanings.[3]

Florida law distinguishes evidence admissible to resolve a patent and a latent ambiguity.  Extrinsic evidence is inadmissible to resolve a patent ambiguity, that is, an ambiguity that "appears on the face of the instrument and arises from the use of defective, obscure, or insensible language." *Crown Mgmt. Corp. v. Goodman*, 452 So. 2d 49, 52 (Fla. Dist. Ct. App. 1984).  But extrinsic evidence is necessary and admissible to establish the correct meaning of a latent ambiguity, which exists if "the language of an agreement is facially clear but an extrinsic fact or extraneous circumstance creates a need for interpretation or reveals an insufficiency in the contract or a failure to specify the rights or duties of the parties in certain situations."  *Taylor v. Taylor,* 183 So. 3d 1121 (Fla. Dist. Ct. App. 2015).  The "bay" example presents a latent ambiguity.

The re-stated agreement contains neither a patent nor latent ambiguity.  The re-stated agreement grants the Company a license to use Darrell's name, image, and likeness in connection with the manufacture, distribution, advertisement, promotion, and sale of endorsed products.  Also, the re-stated agreement requires the Company to "cease production of Stealth and Razorback style Guitars" "upon termination."  The re-stated agreement neither explicitly nor implicitly grants the Company a

---

[3] The "bay" example is borrowed in part from Antonin Scalia, Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, in *A Matter of Interpretation: Federal Courts and the Law* 26 (1997).

license to use the STEALTH and RAZORBACK wordmarks or the Stealth and Ra-zorback guitar designs.  The e-mail exchanges submitted by the Trust are not consid-ered.  The plain meaning of the re-stated agreement controls.

The Trust moves for partial summary judgment on their breach of contract claim for the Company's continued use of the STEALTH and RAZORBACK word-marks and Stealth and Razorback guitar designs after "termination" of the re-stated agreement.  Although the re-stated agreement grants the Company no license to pro-duce Stealth or Razorback design guitars, the Company agreed to "cease production of Stealth and Razorback style [g]uitars" "upon termination":

> The Company shall acquire no rights in the tradenames or designs "Stealth Guitar" or "Razorback Guitar" by virtue of this Agreement, and upon termination of this Agreement shall cease the production of Stealth and Razorback style Guitars.

(Doc. 110-5 at ¶ 17)

The Company argues that the re-stated agreement was never terminated. (Doc. 252 at 10–11)  The re-stated agreement delineates each party's "special right of termination":

> 22. Special Right of Termination by Vincent. Vincent shall have the right to terminate this Agreement upon Thirty (30) days prior written notice to Company in the event of the occurrence of any of the follow-ing contingencies:
>
> (a) If Company is adjudicated as insolvent, declares bankruptcy or fails to continue its business of selling Endorsed Products; or
>
> (b) If Company fails to make payment to Vincent of any sums due pursuant to this Agreement within Ten (10) days following the date such payment is due hereunder, provided that Company is notified in writing of such nonpayment by Vincent or his representative and such payment is not made within Twenty Five (25) days following such no-tification.

(c) If the Company commits any other material default hereunder and fails to cure with Thirty (30) days of receipt of written notice thereof.

23. <u>Special Right of Termination by Company</u>. Company shall have the right to terminate this Agreement upon Thirty (30) days prior written notice to Vincent or his representative in the event of the concurrence of any of the following contingencies:

(a) If Vincent commits any material default hereunder and fails to cure within Thirty (30) days of receipt of written notice thereof.

(Doc. 110-5 at ¶¶ 22–23)  Nothing in the record indicates that either party terminated the re-stated agreement by written notice or otherwise.  In a June 2021 demand letter (Doc. 110-6) Trust's counsel, Jennifer Hamilton, informed the Company that the re-stated agreement "naturally terminated" in October 2020.  Hamilton uses the phrase "naturally terminated" to mean "expired."[4]  But expiration and termination are legally and factually distinct, particularly if the contract provides expressly for, and uses, the word "termination" and if termination governs contractual rights, obligations, or remedies.

According to the Trust, the inclusion of language in certain provisions of the re-stated agreement to qualify the word termination demonstrates a distinction between general termination, which encompasses expiration, and either party's "special right of termination."  But "termination" is used throughout the re-stated agreement consistently to mean the exercise of either party's "special right of termination," and the agreement distinguishes between termination and expiration: "The provisions of

---

[4] As she confirmed at oral argument, by using the phrase "naturally terminated" Hamilton meant in her letter "expired" at the end of the "Contract Period," as defined by the re-stated agreement.  In any event, Hamilton's casual characterization three years after expiration has no legal effect on the former contract.

- 24 -

this paragraph . . . shall survive the termination or expiration of this Agreement." (Doc. 110-5 at ¶ 25)

The re-stated agreement never uses the words "terminate" or "termination" as a substitute for "expire" or "expiration." The re-stated agreement's definition of "Contract Period" is illustrative: "That period of time commencing on the date of this Agreement, and concluding June 30, 2017, unless sooner terminated or extended in accordance with the terms and conditions here of." (Doc. 110-5 at ¶ 1(d)) Because neither party terminated the re-stated agreement, the Company never lost the right to produce "Stealth and Razorback style guitars." The Company is entitled to summary judgment on theories (i)–(iv) and (viii) of the Trust's claim for breach of contract.

By conditioning the Company's right to produce "Stealth and Razorback style guitars" on neither party's terminating the agreement, the parties reasonably distinguish between (1) the parties' respective positions after complete, compliant and satisfactory performance of the agreement followed by expiration at the end of the term of the contract and (2) the parties' respective positions after incomplete, non-compliant and unsatisfactory performance followed by termination during the term of the contract. A post-contractual right conditioned on neither party's terminating the agreement motivates and rewards full and faithful performance under the agreement and deters a non-compliance breach of contract, and a disruption of the parties rightful contractual expectations.

After understandable resistance by the Company and more than seven months after discovery closed, the Trust obtained (reluctant) leave to supplement the record with (1) a screenshot (Doc. 299-1, Ex. N) from the website of Angkor Music, a guitar retailer in Australia, which purportedly shows Angkor's continued sale of Dime endorsed guitars; (2) screenshots (Doc. 299-1, Exs. O–Q) of Instagram posts from November 2025, December 2025, and January 2026 on Angkor's Instagram page purportedly showing endorsed products bearing a serial number beginning with "24" and bearing Darrell's "Dean from Hell" (DFH) copyrighted lightning graphic; (3) screenshots (Doc. 299-1, Exs. R and S) of a Scandinavian Musical Instruments (SMI) website purportedly offering for sale endorsed products bearing serial numbers beginning with "24"; and (4) screenshots (Doc. 299-1, Exs. T and U) of Reverb.com, a webpage purportedly offering for sale endorsed products bearing Darrell's Dean from Hell copyright.

The Company objects under Rule 56(c)(2), Federal Rules of Civil Procedure, that Exhibits N through U are inadmissible. Unauthenticated material may be considered to resolve a motion for summary judgment so long as the material "could ultimately be presented in admissible form." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278 (11th Cir. 2022) (citing *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021). But "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Rule 56, Fed. R. Civ. P., 2010 advisory committee note.

The Trust attempts to authenticate each of the screenshots (Doc. 299-1, Exs. N–U) by the declaration of Rita Haney.  However, each screenshot contains hearsay statements for which the Trust has not established an applicable exception. For example, Exhibit R is a screenshot of a Scandinavian Musical Instruments website, which lists a "DEAN DIMEBAG ML DIME SLIME W/ LIGHTCASE" guitar for 1,599.00€, and which includes a picture of a guitar headstock bearing the serial number "H24101254":



(Doc. 299-1, Ex. R) The statements contained within the screenshot, such as, the item listing, "DEAN DIMEBAG ML DIME SLIME W/ LIGHTCASE," are inadmissible unless the Trust establishes a valid non-hearsay purpose or that a valid hearsay exception applies.  Further, Haney can authenticate by declaration only the screenshot itself.  Haney cannot authenticate the content of the photograph contained within the screenshot or establish the truth of the photograph's contents.

Although claiming that the posts are not hearsay under Rule 801(d)(2)(c), Federal Rules of Evidence, the Trust offers no means to establish that any "seller" is an authorized overseas distributor or dealer of Dean guitars.[5]  Because the Trust fails to show that the material is admissible as presented or to sufficiently explain the admissible form that is anticipated, the Company's objection under Rule 56(c)(2) is sustained.  The Trust's delay is not excused and Exhibits N through U are not considered for either party's motion for summary judgment.

The Company argues that the Trust has not, and cannot, prove the Company breached the re-stated agreement (1) by failing to provide guitar models or (2) by failing to pay for printed cover photos.  Under Rule 56(c), Federal Rules of Civil Procedure, summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Therefore, the burden shifts to the Trust to produce or identify supporting material in the record.  *See generally Celotex*, 477 U.S. 317 (1986).  Because in their response the Trust fails to produce or identify supporting material in the record, the Company is entitled to summary judgment on theories (v) and (vi) of the Trust's claim for breach of contract.

---

[5] The Trust intends apparently to rely on statements on each seller's website: "The evidence can be easily authenticated by showing that the sellers are overseas distributors or dealers of Dean guitars, as evidence by the sellers' websites."  (Doc. 296 at 6)  Of course, any such statements would themselves constitute hearsay.

The Trust moves for partial summary judgment on breach of contract for the Company's registration of the RAZORBACK wordmark, the Razorback guitar design, and the "Dime3" guitar design. The re-stated agreement states:

> **Trademark.** In the event that Company or Vincent desire to obtain a trademark or trademarks for Endorsed Products, Company and Vincent agree to execute any and all documents which either party reasonably believes to be necessary and/or desirable for the successful registration and protection of such trademark or trademarks during the term of this Agreement. Such trademark or trademarks shall be registered in the name of and belong to the Company and Vincent jointly, and each shall have the right to use and employ such marks after termination of this Agreement. The parties shall jointly pay for the cost of registration of any marks developed and owned by the parties pursuant to this Agreement. The Company shall acquire no rights in the trade-names or designs "Stealth Guitar" or "Razorback Guitar" by virtue of this Agreement, and upon termination of this Agreement shall cease the production of Stealth and Razorback style Guitars.

(Doc. 110-5 at ¶ 17)  The parties agreed to joint registration of any trademark on an endorsed product. The Company registered the RAZORBACK wordmark on June 23, 2009, and registered the Razorback guitar design on January 20, 2009. (Docs. 146-5 and 146-1)  Because the RAZORBACK wordmark, the Razorback guitar design, and the "Dime3" guitar design do not qualify as endorsed products, the re-stated agreement does not require joint registration.

The re-stated agreement omits any mention of the "Dime3" guitar design. The re-stated agreement states, "The Company shall acquire no rights in the trade-names or designs 'Stealth Guitar' or 'Razorback Guitar' by virtue of this Agreement[.]"  (Doc. 110-5 at ¶ 17)  *The American Heritage Dictionary* defines the idiom "by/in virtue of" as "on the grounds or basis of; by reason of."  In effect, the parties agreed that the Company would not acquire rights to the Stealth and Razorback

- 29 -

tradenames or guitar designs "by reason of" the re-stated agreement.  The language "[t]he Company shall acquire no rights in the tradenames or designs 'Stealth Guitar' or 'Razorback Guitar' by virtue of this Agreement" clarifies that neither the re-stated agreement nor the parties' performance under the re-stated agreement explicitly or implicitly grant the Company rights in the STEALTH and RAZORBACK trade-names or the Stealth and Razorback guitar designs.  The Company obtained trade-mark rights in the RAZORBACK wordmark and the Razorback guitar design through the Company's actual prior use of RAZORBACK wordmark and the Razor-back guitar design in commerce, not because of either agreement.  Even if afforded the broadest plausible construction to mean "the Company shall acquire no rights in the tradenames or designs 'Stealth Guitar' or 'Razorback Guitar' to which the Com-pany is not otherwise entitled but for the execution of this Agreement," paragraph seventeen does not prohibit the Company's trademark registrations, because neither agreement is a "but-for cause" of the Company's acquisition of the trademark rights. The Company is entitled to summary judgment on theories (vii), (viii), and (ix) of the Trust's claim for breach of contract.

## CONCLUSION

The Trust's motion (Doc. 239) for partial summary judgment is **DENIED**. The Company's motion (Doc. 234) for summary judgment is **GRANTED** on Count I, Count II, Count III, Count IV, Count V, Count VI, Count VIII, Count X,

- 30 -

Count XI, Count XII, and Count XIII but **DENIED** on Counts VII and IX.

ORDERED in Tampa, Florida, on April 24, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE